UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAN CERJANEC, RODRIGO BRAVO,
MARK MODLIN, and WILLIAM
WINFREY, on behalf of themselves and all
others similarly situated;

       Plaintiffs,

v.

FCA US, LLC,

       Defendant.

Case No. 17-10619
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO COMPEL
ARBITRATION, AND IN PART TO DISMISS, AND/OR TO STRIKE CLASS
ALLEGATIONS IN THE FIRST AMENDED COMPLAINT [17]**

---

Plaintiffs are current and former employees of Fiat Chrysler Automobiles (FCA). As a class, they seek relief from an employee-evaluation policy they allege has a disparate impact on employees aged 55 and older. Plaintiffs allege that as a result of this policy, they received lower evaluation scores which resulted in missed career advancements, bonuses, and other employment opportunities. Two Plaintiffs additionally bring individual claims of intentional age discrimination.

Defendant FCA seeks to compel arbitration. FCA asserts that the Plaintiffs assented to arbitration when they continued to work at FCA after receiving notice of the arbitration policy. In the alternative, FCA moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and to strike the class allegations for failure to meet Rule 23 prerequisites.

The parties submitted extensive briefing and the Court heard oral argument on November 8, 2017. For the reasons that follow, the Court will not compel Plaintiffs to arbitrate and will allow

2:17-cv-10619-LJM-EAS    Doc # 32    Filed 12/15/17    Pg 2 of 21    Pg ID 1243

Plaintiffs one additional opportunity to amend their complaint to cure jurisdictional and pleading defects.

## I.

## A.

In 1995, FCA implemented an Employment Dispute Resolution Process (EDRP). (R. 17-3, PID 168.) Under this process, non-union employees had to arbitrate most disputes arising from their employment. (R. 17-3, PID 170–76.) Shortly before implementing the EDRP, FCA sent non-union employees a letter and brochure informing them of the new policy. (R. 17-3, PID 177–79.)

The four named Plaintiffs are long-term employees of FCA. (R. 4, PID 22–23.) They were all hired before 1995. (R. 4.)

Plaintiff William Winfrey, age 61, was hired around August 1984 and remains employed with FCA. (R. 4, PID 23.) He has a law degree and is classified as a Senior Professional. When he applied for a position with FCA, he signed an employment application stating that he would comply with all of FCA's "orders, rules, and regulations." (R. 17-2, PID 156.)

Plaintiff Mark Modlin, age 58, was hired around August 1988. (R. 4, PID 22.) When he applied for a position with Chrysler, he (like Winfrey) signed an employment application stating that he would comply with all of FCA's "orders, rules, and regulations." (R. 17-2, PID 154.) Modlin remained employed with FCA until January 31, 2017 when he alleges he was wrongfully terminated. (R. 4, PID 22.) Modlin has a Master's Degree in Mechanical Engineering and, at the time of his termination, was classified as a Professional. (R. 4, PID 22.)

Plaintiff Rodrigo Bravo, age 60, was hired around 1985 and remains employed with FCA as a Senior Manager. (R. 4, PID 22.) There is no information in the record about any agreements

that Bravo may have signed or otherwise agreed to as part of his application process or during his employment. (R. 17-2, PID 145.)

Plaintiff Dan Cerjanec, age 59, was hired around June 1994. (R. 4, PID 22). When he applied for a position with FCA, he signed an employment application stating that he would bring all claims or lawsuits within 180 days of the challenged action and that he would comply with all of Defendant's "orders, rules, and regulations." (R. 17-2, PID 152.) He remained employed until February 21, 2017, when he alleges he was wrongfully terminated after receiving a low evaluation score. (R. 4, PID 22, 29.) Cerjanec has a Master's Degree in Global Finance and, at the time of his termination, was classified as a Mid-Level Professional. (R. 4, PID 22.)

Plaintiffs' discrimination claims arise out of the manner in which FCA evaluates job performance. The evaluation process is implemented under the direction, supervision and control of senior leadership, and is used on a company-wide basis. (R. 4, PID 26.)

While their description of the process in the amended complaint is not entirely clear, it appears that FCA evaluates employees designated from Professional to Senior Leadership in a two-step process. First, an employee's direct supervisor rates each employee's performance as "High," "Medium," or "Low." (R. 4, PID 25.) This is known as the Performance and Leadership Management Rating (PLM Rating). (*Id*.) Second, management provides a numerical score, known as a Performance and Leadership Management Score (PLM Score). (*Id*.) During this second step, the "calibration process," Plaintiffs allege that employees' photos are displayed and/or used by the managers. (R. 4, PID 26.)  They also allege that managers have access to employee numbers, which generally reflect how long the employee has worked for FCA. (*Id*.) Employees are rated on a one-

to-nine scale. (*Id.*)[1] Scores are then adjusted according to a recommended or "forced" distribution curve. (R. 4, PID 27.) An employee who scores below a five can be placed on a Performance Improvement Program or be terminated. (R. 4, PID 26.) The higher the score, the higher the bonuses, additional pay, and chances of advancement opportunities. (R. 4, PID 27.)

Plaintiffs assert that the Evaluation Process results in employees ages 55 and older receiving lower scores and that, in 2014, 2015, and 2016, Plaintiffs as a class received lower scores than those employees under 55. (R. 4, PID 27–29.)

Cerjanec says FCA terminated him as a result of his low 2016 score. (R. 4, PID 29.) Modlin's lower score also contributed to him leaving his employment. (R. 4, PID 29.)

On March 20, 2017, Plaintiffs filed their amended complaint for a class action alleging disparate impact in violation of the Age Discrimination in Employment Act of 1967 (ADEA) and the Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, *et seq.* (R. 4.) Cerjanec also alleges wrongful termination and Modlin alleges constructive discharge in violation of the ADEA and ELCRA. (R. 4.) Plaintiffs claim that the subjective "calibration" of employees' scores, the use of photographs, the use of employee identification numbers, and the distribution curve give "less favorable and disproportionate[ly] adverse ratings" to salaried, non-union employees aged 55 and older. (R. 4, PID 30.)

**B.**

FCA has moved to preclude litigation in this Court. First, FCA moves to compel arbitration. (R. 17.) FCA contends that Plaintiffs, although hired prior to the implementation of the EDRP, are

---

[1] During oral argument, FCA's counsel explained the process in more detail. Boxes 1, 2, 4 are denoted as "red" and represent the most deficient performance; boxes 3, 5, 7 are denoted as "yellow" and represent some positive performance and some poor performance; and boxes 6, 8, 9 are denoted as "green" and represent the best performance. The Court, though, will focus on the allegations in the amended complaint as this is a motion to dismiss.

bound to arbitrate by continuing to work at FCA after being notified of the EDRP's implementation.

Second, if the Court does not compel arbitration, FCA argues that the complaint should be dismissed on multiple grounds. (R. 17.) With respect to the individual age discrimination claims, FCA says Bravo and Winfrey have failed to assert sufficient factual support, and that Cerjanec and Modlin fail to assert a plausible claim. FCA asks the Court to dismiss Plaintiffs' ADEA class claims because, says FCA, Plaintiffs have not timely exhausted their administrative remedies, ADEA claims cannot be brought under Rule 23, and, alternatively, their proposed class of individuals ages 55 and older is impermissible under the ADEA. Next, FCA asserts that Plaintiffs have failed to properly plead class claims because they have inadequately pled disparate impact and the Rule 23 requirements, and that everyone but Modlin lacks standing. Lastly, FCA asks the Court to dismiss Cerjanec's claims as time barred.[2]

## II.

The Court begins with FCA's motion to compel arbitration.

The Federal Arbitration Act (FAA) provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted).

---

[2] Because FCA's argument relied upon employment applications, which were only attached to its motion, the Court advised the parties that it was converting the portion of the motion seeking dismissal on statute-of-limitations grounds to a Rule 56 motion for summary judgment. (R. 28.) The Court gave both parties an opportunity to submit additional briefing. (*Id.*)

Even so, "[a]rbitration is a 'matter of contract' and 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016) (quoting *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). Therefore, "[b]efore compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003).

Additionally, when, as here, a federal statutory claim is asserted, the court will consider whether Congress intended that claim to be nonarbitrable. *See Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). It is well-settled that employment-related statutory claims, such as ADEA claims, may validly be subject to an arbitration agreement enforceable under the FAA. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). Thus, the focus of this dispute is whether Plaintiffs agreed to arbitrate their claims.

The parties first dispute whether a valid agreement to arbitrate exists between them. Because arbitrations agreements are fundamentally contracts, the court reviews the enforceability of an arbitration agreement according to the applicable state law of contract formation. *See Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007); *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393 (6th Cir. 2003). Under Michigan law (which the parties agree applies), in order for a contract to be considered valid and enforceable, it must have "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of contract." *Thomas v. Lejas*, 468 N.W.2d 58, 60 (Mich. Ct. App. 1991).

6

**A.**

Cerjanec, Modlin, and Winfrey signed employment applications stating that they agreed to follow all "orders, rules, and regulations." (R. 17-2, PID 152, 154, 156.) But FCA is not arguing that, by simply agreeing to follow all "orders, policies and regulations" when they were first hired, Cerjanec, Modlin and Winfrey were bound to arbitrate their claims once they received the letter. Nor do they claim Plaintiffs signed any arbitration agreements or any acknowledgments of an arbitration agreement.

Instead, FCA argues that Cerjanec, Modlin and Winfrey "entered into valid and binding agreements to arbitrate" "by continuing to work for the Company after receiving notice of the EDRP's implementation in 1995." (R. 17, PID 109.) By this, FCA refers to the fact that in May 1995, Cerjanec, Modlin, and Winfrey were sent a letter informing them that Chrysler would soon implement an EDRP. (R. 17-3, PID 177.) Attached to that letter was a brochure that provided an overview of the process and stated about the EDRP, "IT APPLIES TO YOU. It will govern all future legal disputes between you and Chrysler that are covered under the Process." (R. 17-3, PID 178–79.) The 1995 EDRP policy provided for exclusive, final, and binding arbitration for "all eligible disputes whether based on federal, state or local law including breach of contract, discrimination or retaliation claims." (R. 17-3, PID 172.) After receiving this 1995 policy, Cerjanec, Modlin, and Winfrey continued to work at FCA. Thus, argues FCA, they assented to the 1995 policy via their conduct.

It is true that under Michigan law, "acceptance may be implied from the party's conduct when the offer does not require a specific form of acceptance." *Patrick v. U.S. Tangible Investment Corp.*, 595 N.W.2d 162, 167 (Mich. Ct. App. 1999). And, more specific to this case, the Sixth Circuit, applying Michigan law, has found that an arbitration agreement may be accepted though

7

continued employment. *See Tillman v. Macy's, Inc*., 735 F.3d 453, 460 (6th Cir. 2013); *see also Dawson v. Rent-A-Center, Inc.*, 490 F. App'x 727, 730 (6th Cir. 2012). But the governing case law does not suggest that continued employment, by itself, is always sufficient to manifest assent to an arbitration policy. To the contrary, the Sixth Circuit has made clear that continued employment can manifest assent when the employee *knows* that continued employment manifests assent.

In *Seawright v. Am. Gen. Fin. Inc.*, 507 F.3d 967 (6th Cir. 2007), the Court found that a long-term employee had agreed to arbitrate by continuing her employment after receiving notice of the employer's arbitration policy. *Id.* More specifically, the employee received a letter informing of the effective date of the arbitration program and an informational brochure that expressly advised, "Seeking, accepting, or *continuing* employment with [defendant] means that you agree to resolve employment related claims against the company . . . through this process instead of through the court system." *Id*. at 971 (emphasis added). And two years after the program went into effect, plaintiff received another brochure reiterating that "continuing employment" with the defendant meant she agreed to resolve employment related claims through the arbitration program. *Id*. The Court held that plaintiff's "*knowing* continuation of employment after the effective date of the arbitration program constituted acceptance of a valid and enforceable contract to arbitrate." *Id*. at 970 (emphasis added). Subsequent Sixth Circuit cases compelling arbitration likewise involved the employer expressly advising its employee that continued employment would manifest assent to arbitration. *See Dawson.*, 490 F. App'x at 728–29 (finding assent through continued employment when the notice stated that "accepting or continuing employment, or accepting any promotion, pay increase, transfer, bonus, or other benefit of employment would indicate consent to resolve work-related disputes exclusively through arbitration."); *Tillman*, 735 F.3d at 458 (finding an employee subjected herself to arbitration by continuing to work after being

8

informed that she would be bound by the arbitration policy "by accepting or continuing employment with the Company" and that "[u]ntil and unless" she opted out, she would be covered); *see also McGill v. Meijer*, No. 10-1055, 2011 WL 1166895, at *3 (W.D. Mich. March 28, 2011) (finding that an employee, who was hired after the implementation of a dispute resolution policy, accepted the policy by signing an acknowledgement form and by continuing to work when a provision explicitly stated that "continued employment would constitute acceptance").

In *Seawright*, the Court also distinguished a case like this one: *Lee v. Red Lobster Inns of America*, 92 F. App'x 158 (6th Cir. 2004). 507 F.3d at 973. In *Lee*, as here, "the agreement at issue . . . did not contain any provision that stipulated continued employment would constitute acceptance. Thus, the agreement could not be accepted by unilateral action." 507 F.3d at 937.[3]

Additionally, FCA's reliance on *Guelff v. Mercy Health Servc.*, No. 200040, 1999 WL 3344156 (Mich. Ct. App. May 25, 1999) and *Debro v. French*, No. 15-14225, 2017 WL 927622 (E.D. Mich. Feb. 16, 2017) is misplaced. In *Debro*, the plaintiff did not contest consent. The court thus explicitly stated, "importantly, in his response to defendants' motion for summary judgment, plaintiff agrees that his continued employment with Aubree's signifies consent to an arbitration agreement." 2017 WL 927622 at *3. In *Guelff*, the court found consent where the employee had availed herself of provisions in the guidelines manual that also contained the arbitration policy. 1999 WL 3344156 at *2. Here, Cerjanec, Modlin and Winfrey were given notice of the EDRP on its own, not as part of a manual of policies that they otherwise availed themselves to.

---

[3]While *Seawright* and *Lee* apply Tennessee law, their general principles relating to arbitration agreements apply here as well. Neither opinion rests on contract law that is particular to that state or that is in clear conflict with Michigan contract law.

9

At oral argument, FCA asserted that the line in the brochure "IT APPLIES TO YOU. It will govern all future legal disputes between you and Chrysler that are covered under the Process" sufficiently put the employees on notice that continued employment would constitute assent to the EDRP. (R. 17-3, PID 178.)

The Court disagrees. This language does not inform employees how the ERDP applies to them and does not tell them that it applies to them if they continue to work at FCA. It is not a "provision[] that stipulated continued employment would constitute acceptance." *Seawright*, 507 F.3d at 937.

In the absence of any signed agreement or any FCA-distributed materials expressly telling Plaintiffs that they would accept the terms of the EDRP by continuing their employment, the Court cannot find that there was an agreement to arbitrate. *See Stout*, 228 F.3d at 714. Accordingly, the Court denies FCA's motion to compel arbitration with respect to Cerjanec, Modlin, and Winfrey.

**B.**

FCA has failed to produce an employment application for Bravo or any other documentation pertaining to his hire or how he came to agree to the EDRP. (R. 17-2, PID 145.) So he, too, will not be compelled to arbitrate his claims. Additionally, given his 1980s hire date, the Court sees no reason to treat him differently from the other employees hired prior to 1995.

**III.**

Since none of the Plaintiffs will be compelled to arbitrate, the Court now moves to address FCA's Motion to Dismiss.

When, as here, a defendant moves to dismiss pursuant to Rule 12(b)(6), the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs. Under that standard, a court first culls legal conclusions from the

complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable[.]" *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility" that a defendant is liable, it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

## A.

FCA asserts that Cerjanec failed to raise a disparate-impact claim in his EEOC charge, and therefore that claim is not properly exhausted for the class.[4] *See Howlett v. Holiday Inns, Inc.*, 49 F.3d 189 (6th Cir. 1995).

The ADEA requires that an individual exhaust available administrative remedies by filing a charge of unlawful discrimination with the EEOC before filing a lawsuit. *See* 29 U.S.C. § 626(d)(2). "As a general rule, a plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010); *Evans v. Univ. of Mich. Hosp.*, No. 16-10770, 2017 WL 1382295, at * 2 (E.D. Mich. April 14, 2017) ("Plaintiffs alleging employment discrimination under Title VII and the ADEA must exhaust their administrative remedies by first filing a charge of discrimination with the EEOC"). Permitting an action "to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role." *Younis*, 610

---

[4] Modlin filed his EEOC complaint after the amended complaint was filed and therefore the Court will only examine the adequacy of Cerjanec's EEOC complaint. (R. 22-2, PID 508.)

F.3d at 362. Nonetheless, "because aggrieved employees—and not attorneys—usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id*. That Cerjanec may have had the assistance of counsel in his EEOC charge "does not mean that a broad reading may not, or should not, be given." *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 536 (6th Cir. 2001).

The essence of the parties' dispute is whether Cerjanec's EEOC charge put FCA and the EEOC on notice that he was raising a disparate-impact—as opposed to a disparate-treatment—claim. Unlike a disparate-treatment claim, "plaintiffs need not show that a defendant intended to discriminate," to establish a disparate-impact claim. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000). Cerjanec can "instead prove that a particular employment practice, although neutral on its face, has produced a significant adverse effect on a protected group to which the plaintiff belongs." *Id.* In order for a disparate-impact claim to have been properly exhausted, "the plaintiff must indicate in his EEOC charge that a facially neutral policy of the defendant had an unintended adverse impact on the alleged protected class." *Harrison v. Progressive Corp.*, No. 12-625, 2012 WL 4461503, at *9 (N.D. Ohio Sept. 25, 2012)

Two cases provide a helpful contrast to this case. In *Harrison*, the plaintiffs alleged that Progressive's "Value Assessment Tool" produced lower ratings for non-Caucasians and for older employees affecting compensation, promotions, transfers, retention, and tenure. *Id*. at *2. The representative EEOC complaint stated, in part:

> During my employment with Progressive Insurance, I was subject to discriminatory corporate-wide policies, practices, and treatment, through which Progressive discriminated against me in all terms and conditions of my employment on the basis of my age and race. Progressive subjected me to discriminatory compensation, benefits, demotion, title changes, and denial of promotional, transfer, and rehire opportunities for which I was qualified, due to my age and race. At the same time,

> Progressive provided more favorable treatment to Caucasian and substantially younger employees.

*Id.* at *6. The court, relying heavily on *Brown v. Ameriprise Fin. Servs. Inc.*, 707 F. Supp.2d 971, 976–77 (D. Minn. 2010), found that plaintiffs had not exhausted a disparate-impact claim because they failed to identify a neutral policy that caused the disparate impact, the "cornerstone" of a disparate impact claim. *Id.* at *10; *see also Brown*, 707 F. Supp. 2d at 977 (finding that "[a]t bottom, because the charge failed to specifically identify any neutral policy, the cornerstone of an EEO disparate-impact investigation, the Court concludes that [plaintiff] did not exhaust her disparate-impact claim").

Here, in contrast to *Harrison* and *Brown*, Cerjanec *did* identify a neutral policy that he contends is causing a disparate impact on employees over the age of 55. His EEOC complaint states:

> *I and similarly situated other co-workers, 55 years and over, have been routinely subjected to unwarranted lower PLM/Performance Ratings.* Subsequently, due to these lower performance rating scores we have been subjected to different terms and conditions of employment including but not limited to: loss of promotional opportunities, loss of merit and bonus increases, and more favorable job assignments. We have also been subjected to disciplinary action and discharge. . . .
>
> I believe I and others have been subjected to different terms and conditions of employment, discipline and discharge, due to our age, 55 years and older, in violation of the Age Discrimination in Employment Act of 1967, as amended.

(R. 22-2, PID 507 (emphasis added).) By specifically mentioning the PLM and the PLM Rating, and its alleged adverse effects on older workers, it is reasonable to construe Cerjanec's EEOC complaint as raising a complaint about the process that produced those ratings. The EEOC could reasonably interpret this charge as involving a discriminatory effect based upon the referenced PLM process, and not merely discriminatory intent. In other words, an EEOC investigation into

potential liability based on disparate impact could have been "reasonably expected to grow out of" Cerjanec's EEOC charge.

Thus, while close, the Court finds that Cerjanec exhausted the class disparate-impact claim.

## B.

FCA next argues that many of Plaintiffs' claims are time-barred. In particular, FCA argues that the claims based on the 2014 and 2015 PLM scores are barred by a provision in Cerjanec's employment application requiring that Cerjanec bring "any claim or lawsuit within six (6) months after the date of the employment action that is the subject of the claim or lawsuit." (R. 17-2, PID 152.) It further asserts that Cerjanec cannot bring a claim for the 2016 PLM scores because he was terminated prior to the release of those scores.

## 1.

"It is well-settled that parties to a contract may agree to an abbreviated period of limitations different from the period authorized by statute so long as it is reasonable." *Smithson v. Hamlin Pub, Inc*., 15-11978, 2016 WL 465564, at \*3 (E.D. Mich. Feb. 8, 2016) (citing *Order of United Commercial Travelers Am. v. Wolfe*, 331 U.S. 586, 608 (1947); *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357-59 (6th Cir. 2004). The Sixth Circuit has held that there is nothing inherently unreasonable about a six-month limitation period. *Id*.; *see also Myers v. Western-Southern Life Ins. Co.*, 849 F.2d 259, 262 (6th Cir. 1988). Contractual provisions shortening statute of limitations periods are reasonable if "(1) the claimant has sufficient opportunity to investigate and file an action; (2) the time is not so short as to work a practical abrogation of the right of action; and (3) the action is not barred before the loss or damages can be ascertained." *Thurman*, 397 F.3d at 357 (quoting *Timko v. Oakwood Custom Coating, Inc.*, 625 N.W.2d 101, 106 (Mich. Ct. App. 2001)).

14

Here, Cerjanec does not argue that the six-month limitations period did not afford him sufficient opportunity to investigate and file an action.  Nor does he argue that it abrogated his right of action or prevent him from being able to ascertain any loss or damages.

Cerjanec does argue that the EEOC 300-day statute of limitations "trumps" the 180-day contractual statute of limitations. (R. 29, PID 1068.) But the case he relies on, *Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769 (E.D. Mich. 2002), is distinguishable. *Lewis* involved Title VII, FMLA, and ELCRA claims. The court found, like other courts in this district, that the 180-day limitations provision was unenforceable as to the Title VII claim because an individual cannot file suit under Title VII without a right to sue letter from the EEOC and that process can take more than 180 days. *Id.* So the contractual provision effectively abrogated the plaintiff's right to bring a Title VII claim. *Id.* But "the enforcement mechanisms of Title VII and the ADEA are not identical." *Smithson*, 2016 WL 465564, at *4. More specifically, "Unlike Title VII, there is no requirement that an ADEA plaintiff wait for receipt of a Right to Sue letter before filing suit." *Id.* at *5; *see also* 29 U.S.C. § 626(d)(1) (providing that an employee may bring an ADEA claim 60 days after filing an EEOC charge even if the employee has not yet received a right to sue letter). As for the FMLA claim, the *Lewis* court did not enforce the contractual limitations period because of explicit statutory language that appeared to prohibit a shortened limitations period. *Id.* at 772–73. And the court did enforce the contractual period for the ELCRA claim. *Id.* at 773–74. Thus, *Lewis* did not hold that the ADEA's statute of limitations trumps a shorter contractual statute of limitations, but rather found that, for other statutes, a contractually-shortened statute of limitations was unenforceable.

Cerjanec also argues that the statute-of-limitation provision is unenforceable because the employment application lacks mutuality of obligation. (R. 29, PID 1065.) Cerjanec relies on "two

binding Sixth Circuit *Ryan's Family Steak Houses* cases." (R. 29, PID 1065.) The Court can find

only one: *Floss v. Ryan's Family Steak House, Inc.* 211 F.3d 306 (6th Cir. 2000). But *Floss* applied

Kentucky and Tennessee law where "[a] promise constitutes consideration for another promise

only when it creates a binding obligation." 211 F.3d at 315. Under controlling Michigan law, if a

contract has adequate consideration, it necessarily has mutuality of obligation. *See J&N Koets,*

*Inc. v. OneMarket Props. Lake Point, LLC*, No. 324007, 2015 WL 155890, at *3 (Mich. Ct. App.

Jan. 12, 2016); *see also Hall v. Small*, 705 N.W.2d 741, 744 (Mich. Ct. App. 2005). So this

argument is unpersuasive.

The Court will therefore enforce the six-month statute of limitations on Cerjanec's claims.

## 2.

Plaintiffs raise three arguments for why their claims are timely: the Ledbetter Fair Pay Act

(R. 29),[5] the continuing-violation doctrine (R. 22, PID 481), and equitable tolling. (*See id.*) The

Court advised the parties that it intended to address the statute of limitations issue under the Rule

56 standard. Even so, as will be explained, the present record is simply inadequate for the Court

to adequately address Plaintiffs' reliance on the continuing-violation doctrine and request for

equitable tolling.

The 2009 Ledbetter Fair Pay Act, 42 U.S.C. § 2000e-5(3), was passed to overturn the

Supreme Court's decision in *Ledbetter v. Goodyear Tire Rubber Co.*, 550 U.S. 618, (2007).

Ledbetter challenged a discriminatory compensation scheme whereby unfavorable evaluations

caused her to receive a lower salary over the course of years as a result of her gender. *Ledbetter*,

550 U.S. at 621. The compensation scheme affected her salary without her knowledge. *See id.*, at

---

[5] The Court is troubled by the fact that Plaintiffs did not raise this argument in their original briefing. They only did so after the Court permitted supplemental briefing on the Rule 56 issue. But Defendants had the opportunity to respond. (R. 30.)

643–45 (Ginsburg, J., dissenting). The Supreme Court found Ledbetter's EEOC charge was untimely. While Ledbetter argued that each paycheck she received under the evaluation policy was a "discriminatory act" for purposes of bringing a timely EEOC complaint, the Supreme Court found that a "pay-setting decision is a discrete act that occurs at a particular point in time." *Id.*

In response, the Ledbetter Fair Pay Act (which amends Title VII, the ADA, and the ADEA) provides, in pertinent part:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e(3)(A). Simply put, the FPA deems each paycheck issued pursuant to a discriminatory compensation decision an independent, actionable employment practice under the ADEA. The Act also explicitly provides for "recovery of back pay for up to two years preceding the filing of the charge . . . ." 42 U.S.C. § 2000e-5(e)(3)(B).

A threshold question on the statute's applicability is whether Plaintiffs are challenging a compensation scheme. *See Robison v. AAA of Michigan*, No. 10-11159, 2011 WL 2271296, at *3 (E.D. Mich. June 8, 2011). In *Robison*, for example, plaintiff was challenging an annual audit and performance-evaluation process. *Id*. at *1. This evaluation process affected not just salary, but also "job opportunities, promotions, and other job benefits." *Id*. at *4. The audits and evaluations were discrete, annual events of which the plaintiff was aware. *Id*. As the court explained in finding the FPA did not apply,

> [Plaintiff] does not allege that [defendant] has an unlawful compensation scheme. There is also no claim that [plaintiff's] similarly situated non-African American counterparts have been over time been paid significantly more under a discriminatory compensation scheme because of their race. Rather, as stated, [plaintiff] claims racial employment discrimination based on discrete acts—an unfavorable audit, evaluation, and replacement—which she was aware of and

17

which she claims prevented her from receiving a pay increase, bonus, promotion, and other job opportunities.

*Id.*

Given the similarities of the cases, the Court finds *Robison* persuasive. Plaintiffs here are challenging FCA's "Evaluation Process." (*See* R. 4. 21, 27–28, 31–32.) Each year, Plaintiffs know their respective scores (on a 1-9 scale) as well as how that score will affect them. (*See id.*) By Plaintiffs' own account, this score affects not just salary, but annual bonuses, promotions, retirement benefits, medical costs, as well as "other privileges and benefits." (R. 4, PID 34.) Additionally, a low score can cause an employee to go under special review, which may eventually lead to termination. (*See* R. 4.) As the allegations in this case involve discrete acts of discrimination—the yearly Evaluation Process and resulting scores—and not a challenge to a compensation system, the FPA does not apply.

Plaintiffs alternatively contend that their claims are timely under the continuing-violation doctrine. Continuing violations fall into two categories. *See Sharpe v. Cureton*, 319 F.3d 259, 266–69 (6th Cir. 2003). The first category is where there is evidence of discriminatory activity, such as unequal pay, "giving rise to a claim of continuing violation." *Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir. 1991) (*abrogated in part by Sharpe*, 319 F.3d at 267–68). The Supreme Court has held that the first category does not apply when each incident is a "discrete act such as termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). These discrete acts stand in contrast to claims such as a hostile work environment where the activity cannot be said to occur on any particular day. *Id.* at 115–16. The second category occurs where there has been a "long-standing and demonstrable policy of discrimination." *Burzynski v. Cohen*, 264 F.3d 611, 617–18 (6th Cir. 2001). In addition to establishing the existence of a long-standing policy of discrimination, this category also requires

18

the plaintiff to establish that at least one discriminatory act occurred within the statute of limitations period. *Haithcock v. Frank*, 958 F.2d 671, 678 (6th Cir. 1992) (*abrogated on other grounds by Taylor v. Donahue*, 452 F. App'x 614, 619 (6th Cir. 2011)). Here, this step would require plaintiffs to establish a prima facie case of age discrimination. *See Neal v. Shelby Cnty. Gov't Cmty. Servs. Agency*, 815 F. Supp.2d 999, 1006 (W.D. Tenn. 2011).

It is premature for the Court to determine whether Plaintiffs have established either category of a continuing violation as the parties have not yet conducted discovery. *See, e.g., Harrison v. Progressive Corp.*, No. 12-625, 2012 WL 4461503, at *11 (N.D. Ohio Sept 25, 2012); *Caldwell v. Rowland*, 932 F. Supp. 1018, 1021–22 (E.D. Tenn. 1996); *Parrish v. Ford Motor Co.*, 953 F.2d 1384 (table), 1992 WL 20305, at * 6–7 (6th Cir. Feb. 7, 1992).  The Court will therefore deny FCA's motion for summary judgment regarding its statute-of-limitations defense in order to allow both parties an opportunity to conduct discovery.[6]

Lastly, Plaintiffs claim that equitable tolling should allow the Court to consider the 2014 and 2015 PLM scores. Equitable tolling should be granted sparingly. *Amini v. Oberlin Coll.*, 259 F.3d 493, 500 (6th Cir. 2001). Courts look at the following factors to determine whether equitable tolling is appropriate: "(1) lack of notice of the filing requirement; (2) lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the defendant; and (5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement for filing his claim." *Id*. Like the continuing violation argument, the current record is inadequate for the Court to determine whether equitable tolling applies and will permit discovery on this issue.

---

[6] Given the limited briefing and development of the record on this issue after the Court converted the Rule 12(b)(6) motion, FCA may seek  leave, at the appropriate stage in the litigation, to file a second summary judgment motion regarding the statute of limitations.

**C.**

FCA also seeks dismissal of the class allegations. FCA asserts that ADEA claims may not be brought as a Rule 23 class action. (R. 17, PID 117); *Butcher v. Gerber Prod. Co.*, 88 F. Supp. 2d 788, 790 n. 1 (W.D. Mich. 2000) ("The ADEA does not permit traditional Fed. R. Civ. P. 23 class actions"). Plaintiffs concede this point in their response. (R. 22, PID 489.) Thus, the claims brought pursuant to Rule 23 will be dismissed.

**D.**

Lastly, FCA argues that Plaintiffs' suit was premature because they failed to wait sixty days after Cerjanec filed his EEOC charge before filing their complaint. (R. 25, PID 913.)

FCA is correct that an ADEA claim cannot be brought in federal court "until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission." 29 U.S.C. § 626(d)(1). Cerjanec filed his complaint with the EEOC on March 1, 2017. (R. 4-1, PID 49; R. 17-4, PID 182.) He then filed his amended complaint on March 20, 2017—still within the 60-day window. (R. 4.)

In this Circuit, the 60-day requirement is jurisdictional. *Chapman v. City of Detroit*, 808 F.2d 459, 462 (6th Cir. 1986). Thus, there is no dispute that the case was prematurely filed and subject to dismissal. But it is equally clear that the 60-day time period has long since passed and the case is now timely. In a similar situation, at least one other court in this Circuit allowed the plaintiff to amend the complaint, finding this "the most efficient and best course." *Roe v. Oakmont Resort Condo. Ass'n*, No. 05-538, 2006 WL 568615, at *2 (E.D. Tenn. March 7, 2006). Indeed, the Sixth Circuit seemed to anticipate such a remedy. *Chapman*, 808 F.3d at 462 ("When this [60-day] requirement became an issue in the case the plaintiffs did not tender an amended complaint to allege that the requirement had been satisfied or offer any proof to that effect. Thus, the

complaint was subject to dismissal."). The Court will thus allow the Plaintiffs to file another amendment complaint.

### E.

Although FCA makes other arguments for dismissal, the Court pauses at this point. The complaint needs to be amended to address this timing issue and for Plaintiffs to plead a collective (as opposed to a class) action. As a result, before addressing the other pleading deficiencies raised in FCA's motion to dismiss, the Court will allow Plaintiffs to submit one final amended complaint to address all alleged deficiencies. The Court therefore denies the remainder of FCA's motion to dismiss and strike without prejudice to refiling.

### IV.

For the reasons given, the Court DENIES FCA's Motion to Compel Arbitration and GRANTS IN PART AND DENIES IN PART FCA's Motion to Dismiss and Motion to Strike Class Allegations. The Rule 23 ADEA claims are dismissed, but Plaintiffs may submit one final amended complaint addressing the issues raised above and any pleading deficiencies identified in FCA's motion to dismiss.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: December 15, 2017          U.S. DISTRICT JUDGE

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 15, 2017.

s/Keisha Jackson
Case Manager